NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

FILED
November 19, 2019
Carla Bender
4th District Appellate
Court, IL

2019 IL App (4th) 170426-U

NO. 4-17-0426

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| SHAUN DANDRIDGE, | ) | No. 16CF731 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed the trial court's judgment because defendant did not receive ineffective assistance of counsel.

¶ 2 In June 2016, defendant, Shaun Dandridge, was charged with being an armed habitual criminal. 720 ILCS 5/24-1.7(a) (West 2014).

¶ 3 At his March 2017 jury trial, the State presented eyewitness testimony that defendant was inside a red Ford Expedition and was observed with at least one firearm in his hands. Later the same day, the police stopped the Expedition while defendant and others were in the vehicle, and the police found a firearm, cannabis, and a cellular phone.

¶ 4 The police requested firearms testing but not deoxyribonucleic acid (DNA) or fingerprint testing. The Illinois State Police forensics laboratory tested the firearm, but the examiner did not use clean techniques to prevent DNA contamination.

¶ 5        Defendant had two prior convictions, one for armed robbery and the other for possession of a controlled substance with intent to deliver.

¶ 6        During deliberations, the jury asked a question about the definition of "knowingly possessed." The trial court told the jury that it had already heard the law, and the court did not provide a definition. The jury found defendant guilty, and the court sentenced him to nine years in prison.

¶ 7        Defendant appeals, arguing that his trial counsel was ineffective because counsel (1) failed to object to evidence that tended to show defendant was selling cannabis, (2) failed to offer a stipulation that defendant's prior convictions satisfied the armed habitual criminal statute, (3) acquiesced to the trial court's answer to the jury's question about the definition of "knowingly possessed," and (4) failed to request a discovery sanction for the State's spoliation of evidence. We disagree and affirm.

¶ 8                                    I. BACKGROUND

¶ 9                                A. Pretrial Proceedings

¶ 10        In June 2016, defendant was charged with being an armed habitual criminal. The charging information alleged that defendant knowingly possessed a firearm after having convictions for armed robbery in 1996 and possession of a controlled substance in 2005.

¶ 11        In January 2017, defendant moved to continue his trial because the firearm had not been tested for DNA and fingerprints. The State responded that it had not requested DNA or fingerprint testing on the firearm. The State moved to obtain a buccal swab from defendant, who had no objection to providing the swab. The trial was then continued.

¶ 12        At a hearing in March 2017, the State said that it had sent the firearm for DNA testing as requested but the lab could not test it because it had previously been test-fired without

DNA-contamination precautions and had also been handled by the assistant state's attorney and her investigator. The State said there was ammunition in the chamber that was available for DNA and fingerprint testing. Defense counsel spoke with defendant, and defendant requested that they proceed to trial rather than wait for testing on the ammunition.

¶ 13                                   B. The Jury Trial

¶ 14          Later in March 2017, the case proceeded to a jury trial. Iisha Dean testified that she was in her car with friends on June 4, 2016, when she heard gunshots and saw a man shooting at a red Ford Expedition sport utility vehicle (SUV). The SUV stopped, turned around, and drove away. Dean followed the SUV until it stopped and a person she identified as defendant got out of the SUV from the back seat on the driver's side. She said the defendant had a "long gun" and a "shorter gun." No one else exited the vehicle. Dean recognized defendant and later testified on cross-examination that she knew his father through church. Dean reported that defendant said, "they just shot at me." Dean told defendant that she knew and she was on the phone with the 911 operator. Defendant returned to the back seat of the vehicle, and it drove away.

¶ 15          Decatur police officer Eric Havens testified that on June 4, 2016, just after 8 p.m., he stopped a red SUV after receiving a report of shots fired. Havens said that defendant exited the right rear door of the vehicle but was ordered back inside before he was arrested. Havens observed bullet holes in the vehicle and drugs and a gun inside it.

¶ 16          Decatur police officer Ryan Wicks testified that he assisted with the stop. Wicks ordered defendant to keep his hands outside the window, but defendant brought his left hand back into the SUV, moved it down to his left side, and motioned towards the front passenger seat. His hand was in the car for two or three seconds. Wicks had seen defendant earlier that day

at 3 p.m. regarding an incident in which defendant was robbed of his cellular phone at gunpoint. After exiting the vehicle, defendant told Wicks that he went to Metro PCS and bought a new phone after his old phone was taken. Defendant told Wicks that the robbery was related to the shooting.

¶ 17		Officer Scott Marquis testified that he searched the red SUV. He found a Metro PCS bag with a firearm in it and a box for a Samsung Galaxy Core Prime cellular phone in the front passenger seat. The gun was sticking out of the top of the bag, and it was loaded. Marquis wore gloves when he collected the evidence, and he put the gun, magazine, and chambered bullet into separate evidence bags.

¶ 18		Marquis testified that the packaging for the cellular phone had an international mobile equipment identity (IMEI) number and a telephone number written on the top of the box. The police found a white Samsung Galaxy Core Prime cellular phone with matching numbers on defendant's person after arrest.

¶ 19		Marquis further testified he found a digital scale in the second row of the SUV and two bags of cannabis in the third row of the SUV. The trial court admitted the scale and cannabis into evidence without objection.

¶ 20		Officer Austin Clark testified he responded to the 911 call. He spoke with Dean and took her to the scene of the traffic stop where she identified defendant. Clark testified that Dean told him she saw defendant with a black handgun.

¶ 21		Carolyn Kersting, a firearms examiner with the Illinois State Police forensic laboratory, testified that she tested the firearm recovered from the SUV. She wore gloves when examining the firearm but did not use "clean techniques" to prevent DNA contamination. Kersting explained that was because the Decatur Police had requested firearms testing but not

DNA or fingerprint testing.

¶ 22 The State offered into evidence certified copies of defendant's convictions, and the trial court admitted them without objection.

¶ 23 In defendant's case-in-chief, Tyrrina Dandridge, defendant's sister, testified that on June 4, 2016, defendant along with Jalicia Comage, Jasmine Adams, and Lamar Williams, picked her up in a red SUV and they went to Metro PCS so that defendant could buy a new phone. Comage was the driver. After purchasing the phone, they tried to find Ahquavious Bradford and Shania Kremer in an attempt to get defendant's old phone back. While looking for Bradford and Kremer, they picked up Deontre Wade.

¶ 24 Knowing that Kremer's grandparents lived on Packard, they went to that area. On Packard, Bradford shot at the SUV. They drove around the corner and pushed Wade out of the car. Comage then moved to the passenger seat, and Tyrrina drove the SUV back to the intersection of Packard and Kyle. There, multiple people including Tyrrina left the vehicle and the scene. Tyrrina never saw a gun in the SUV.

¶ 25 Prior to defendant's testimony, the court allowed the State to impeach him with a 2009 conviction for possession with intent to deliver a controlled substance. Defendant then testified he was robbed of his phone at gunpoint by Bradford and Kremer and he flagged down a police officer to report it. His sister offered to buy him a new phone at Metro PCS, and they each obtained new phones there. Defendant acknowledged the phone box in the white bag was his. They then drove the SUV to talk with Kremer's grandmother. They were looking for her house when Bradford shot at the vehicle. Williams pulled out a gun. Defendant wanted to go back to the scene of the shooting to see if there were witnesses.

¶ 26 Defendant testified that Tyrrina and Wade exited the SUV, Comage moved to the

driver's seat, and Williams moved to the front passenger seat. Defendant exited the SUV and talked with Dean. Defendant testified he did not have a gun. Defendant asked Dean to call the police. While he was talking with Dean, Williams exited the SUV, someone said police were en route, and Williams went back inside the vehicle. Comage was in shock and could not drive. Defendant wanted to get Comage away from the area before talking to police. Defendant, Comage, Adams, and Williams drove away towards Comage's house.

¶ 27        When he heard sirens, Williams panicked, jumped out of the SUV, and ran off. Adams climbed into the front passenger seat where Williams had been. Adams found the gun in the Metro PCS bag. Defendant did not see Williams put the gun in the bag. Defendant testified that when they were stopped, he put his hands out the window and did not do anything with the items in the car.

¶ 28        Defendant admitted he had two prior convictions that formed the basis of the charge. He said he committed the armed robbery when he was 17 years old and it did not involve a firearm. He said he had since obtained a job and has had children. The defense rested.

¶ 29                          C. Jury Deliberations

¶ 30        After closing argument, the photograph of the cannabis found in the vehicle, along with two other photographs, were sent without objection to the jury room at the State's request.

¶ 31        During deliberations, the jury sent out a note asking, "What is the legal definition of knowingly possessed? Does it mean in his hand, in the vehicle?" With the agreement of the State and defense counsel, the trial court told the jury, "You have heard the evidence and instruction of law. Please continue with your deliberations." The jury found defendant guilty and the court later sentenced defendant to nine years in prison.

¶ 32        This appeal followed.

¶ 33                        II. ANALYSIS

¶ 34        Defendant appeals, arguing that his trial counsel was ineffective because counsel (1) failed to object to evidence that tended to show defendant was selling cannabis, (2) failed to offer a stipulation that defendant's prior convictions satisfied the armed habitual criminal statute, (3) acquiesced to the trial court's answer to the jury's question about the definition of "knowingly possessed," and (4) failed to request a discovery sanction for the State's spoliation of evidence.

¶ 35        A. The Applicable Law Concerning Ineffective Assistance of Counsel

¶ 36        All defendants enjoy the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767.

¶ 37        To show deficient performance, it is not sufficient that defendant show that counsel's representation was imperfect, because *Strickland* guarantees only a " 'reasonably competent attorney.' " *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Rather, a defendant must show that the representation " 'undermined the proper functioning of the adversarial process' " to the extent that the defendant was denied a fair trial. *Id.* (quoting *Strickland*, 466 U.S. at 686). This court is highly deferential of counsel's performance (*People v. McGath*, 2017 IL App (4th) 150608, ¶ 38, 83 N.E.3d 671) because there "are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."

*Strickland*, 466 U.S. at 689.

¶ 38 To demonstrate deficient performance, a defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327, 948 N.E.2d 542, 547 (2011). Counsel's strategic choices are virtually unchallengeable on appeal. *Id.* at 333. Whether and how to conduct a cross-examination is generally a matter of trial strategy. *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 26, 105 N.E.3d 996. The content of a closing argument is generally a matter of trial strategy. *People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 15, 986 N.E.2d 204. To this point, the United States Supreme Court has explained as follows:

> "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers." (Internal quotation marks omitted.) *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).

¶ 39 To establish prejudice, a defendant must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 63, 115 N.E.3d 1148. A reasonable probability is a probability which undermines confidence in the outcome of the trial. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25

N.E.3d 601.

¶ 40                              B. Evidence of Uncharged Conduct

¶ 41          Defendant argues that trial counsel was ineffective because counsel did not object to the evidence of marijuana that was found within the SUV. In particular, defendant contends that no reasonable attorney would fail to object to testimony about the digital scale and the two bags of cannabis, as well as to the photograph of the cannabis. Defendant asserts that this evidence is irrelevant to the case before the jury.

¶ 42          However, even if defendant's contention is correct, he is unable to show that this evidence was so prejudicial that, had it not been admitted, there is a reasonable probability that the result of the proceeding would have been different.

¶ 43          The strongest evidence in this case was (1) Dean's testimony that defendant possessed a firearm in his hand and (2) testimony that a firearm was later found in a bag containing property owned by defendant. Dean, while on the scene, identified defendant and told police that he had a black handgun in his hand. She testified that she recognized defendant because she knew his father through church. Officer Wicks testified that after the SUV was stopped, defendant brought his left hand back into the SUV, disobeying police orders, and moved it down to his left side before making a motion towards the front passenger seat. The implication of this testimony was that this was an opportunity for defendant to stow the firearm in the Metro PCS bag. The police found a black handgun in the Metro PCS bag, which also contained the box for defendant's new cellphone. The matching cellphone was found on defendant's person.

¶ 44          Considering the above evidence, excluding the cannabis evidence would not have created a reasonable probability that the results of the trial would have been different.

¶ 45                    C. No Stipulation for Prior Convictions

¶ 46          Next, defendant argues that trial counsel was ineffective because counsel did not offer to stipulate that defendant had two prior felony convictions, which would have satisfied the requirements of the armed habitual criminal offense. The State responds that a reasonable attorney may want the jury to know of the particulars of these offenses so that they can see the age and dissimilarity of these offenses in comparison to the present charge. We agree with the State.

¶ 47          The prior charges include an armed robbery with a knife and baseball bat from 21 years ago and a drug delivery case from 11 years ago. A reasonable defense attorney might want the jury to know that these crimes were quite old and that neither involved a firearm. In fact, this is precisely what happened during defendant's direct examination, when defendant testified about the different nature of the past crimes and how he had since changed as a person. Because this matter could be trial strategy—and a quite valid strategy at that—it constitutes no basis to reverse.

¶ 48                    D. Agreeing to Not Answer Jury's Question

¶ 49          Next, defendant argues that trial counsel was ineffective because he did not argue that the jury's question about the definition of "knowingly possessed" should be answered. The State responds that a reasonable attorney might consider too risky the trial court's providing new instructions to the jury without counsel's having an opportunity to address those instructions in closing argument. We agree with the State.

¶ 50          Further, defense counsel might have another reason to not agree to potentially clarifying instructions. The objective for any criminal defense attorney is to help the jury find reasonable doubt. A jury question could be viewed by a reasonable attorney as an indication that

some jurors are unsure or confused, which in turn could lead those jurors to believe the State did not prove its case beyond a reasonable doubt.

¶ 51                                        E. No Request for Discovery Sanction

¶ 52        Last, defendant argues that trial counsel was ineffective because he did not request a discovery sanction in relation to the handling of the firearm and any associated DNA evidence. The State argues (1) that the defense did not initially request DNA testing, and when it did so, the firearm had already been contaminated, (2) there is no evidence that usable DNA evidence ever existed on the firearm, and (3) even if defense counsel could have asked for Illinois Pattern Jury Instructions, Civil, No. 5.01 (2011) (hereinafter IPI 5.01), counsel might choose to not do so as a matter of trial strategy. We agree with the State.

¶ 53        IPI 5.01 states that if a party does not offer evidence which is within its power to produce, the jury may make an adverse inference. *Id.* IPI 5.01 addresses both parties, including the defense. This instruction is a double-edged sword and is problematic in criminal cases where the defendant is under no obligation to produce any evidence. As the State notes, a reasonable attorney could fear that IPI 5.01 could cause the jury to improperly believe the defendant has a burden of proof.

¶ 54        The First District highlighted this problem in *People v. Clarke*, 391 Ill. App. 3d 596, 617-18, 915 N.E.2d 1, 19 (2009), explaining as follows:

> "In this case, had defense counsel tendered IPI Civil (1995) No. 5.01, the comments on the missing evidence may have violated defendant's presumption of innocence ***. While defendant argues that this instruction would have supported defendant's claims of police abuse, the jury may have improperly imposed a burden of proof on defendant to present evidence ***. It is impermissible for the

- 11 -

prosecution to attempt to shift the burden of proof to the defense. The defense is under no obligation to present any evidence."

¶ 55    As in *Clarke*, in this case it would been problematic for the jury to hear that they may make an adverse inference against a party which fails to produce evidence within its control. This could have damaged the fundamental principles of the presumption of innocence and that a defendant bears no burden of proof. In closing argument, defense counsel argued as follows:

"The State took the gun, sent the gun to the Illinois [D]epartment of [S]tate [P]olice. Sounds great, right? Do DNA, do fingerprints, all the things that you do in a case like this to determine, you know, who had possession of that gun.

What happened? No DNA, no fingerprints. Why not? We wanted that. It isn't available to us. Is there something, some reason, why this wasn't done? This case would never have been in front of you if, in fact, those tests had been done."

¶ 56    Counsel's argument shows that declining to ask for IPI 5.01 was a legitimate trial strategy. Defendant gets the benefit of arguing that the State failed to produce evidence that it should have, and he does not run the risk of the jury's using IPI 5.01 against him.

¶ 57    III. CONCLUSION

¶ 58    For the reasons stated, we affirm the trial court's judgment.

¶ 59    Affirmed.